Approved: _____
KYLE A. WIRSHBA / MATTHEW J.C. HELLMAN
Assistant United States Attorneys

Before:   THE HONORABLE JAMES L. COTT
United State Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - - - x
                                      :
UNITED STATES OF AMERICA              :
                                      :
          - v. -                      :
                                      :
SUN HOI YING,                         :
     a/k/a "Sun Haiying,"             :
                                      :
               Defendant.             :
                                      :
- - - - - - - - - - - - - - - - - - - x

# 22 MAG 1711

**SEALED COMPLAINT**

Violations of
18 U.S.C. §§ 371, 951,
and 2

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

          KELSEY PALERMO, being duly sworn, deposes and says
that she is a Special Agent with the Federal Bureau of
Investigation ("FBI"), and charges as follows:

### COUNT ONE
(Conspiracy to Act as an Agent of a Foreign Government
Without Notifying the Attorney General)

          1.    From at least in or about February 2017, up to and
including in or about February 2022, in the Southern
District of New York, the People's Republic of China
("PRC"), and elsewhere, and in an offense begun and
committed out of the jurisdiction of any particular State or
district of the United States, SUN HOI YING, a/k/a "Sun
Haiying," the defendant, and others known and unknown, at
least one of whom is expected to be first brought to and
arrested in the Southern District of New York, knowingly did
combine, conspire, confederate, and agree together and with
each other to commit an offense against the United States,
to wit, acting as an agent of a foreign government without
prior notification to the Attorney General, in violation of
Title 18, United States Code, Section 951.

2.    It was a part and an object of the conspiracy that SUN HOI YING, a/k/a "Sun Haiying," the defendant, and others known and unknown, knowingly acted in the United States as an agent of a foreign government, to wit, the PRC Government, without prior notification to the Attorney General, as required by law, in violation of Title 18, United States Code, Section 951.

<u>Overt Acts</u>

3.    In furtherance of the conspiracy and to effect the illegal object thereof, SUN HOI YING, a/k/a "Sun Haiying," the defendant, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York, the PRC, and elsewhere:

a.    In or about March 2017, SUN, on behalf of the PRC Government, engaged a private investigation firm ("P.I. Firm-1") based in the United States to obtain personal information for twelve individuals located in the United States who SUN identified as Chinese criminals who were considered fugitives by the PRC Government.

b.    On or about December 1, 2019, SUN asked a local U.S. law enforcement officer to contact an individual ("Victim-3") and request that Victim-3 meet with SUN in New York City.

c.    On or about December 1, 2019, in New York City, SUN met with and threatened Victim-3 to pressure Victim-3 to enter into a settlement with the PRC Government.

(Title 18, United States Code, Sections 371 and 3238.)

**COUNT TWO**
(Acting as an Agent of a Foreign Government Without Notifying the Attorney General)

4.    From at least in or about February 2017, up to and including in or about February 2022, in the Southern District of New York, the PRC, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, SUN HOI YING, a/k/a "Sun Haiying," the defendant, who is expected to be first brought to and arrested in the Southern District of New York, knowingly acted in the United States as an agent of a foreign government, namely, the PRC Government, without

2

prior notification to the Attorney General, as required by law.

(Title 18, United States Code, Sections 951, 2, and 3238.)

The bases for my knowledge and for the foregoing charges, are, in part, as follows:

5.   I am a Special Agent with the FBI, and, as such, I have participated in numerous counterintelligence investigations.  Among other things, my duties with the FBI have included investigations involving agents working at the direction of foreign governments without prior notification to the United States.  Based on my training and experience, I have become knowledgeable about criminal activity, particularly violations of the federal statutes governing the conduct of foreign agents.  I have been personally involved in the investigation of this matter.

6.   This affidavit is based upon my own knowledge, my conversations with others, including other law enforcement agents, and my examination of reports and records.  Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Overview

7.   The FBI has been involved in an investigation of individuals who, working at the direction of the PRC Government, have engaged in an international campaign, known alternatively as "Operation Fox Hunt" and "Operation Skynet" (together, "Operation Fox Hunt"), to pressure individuals located in the United States and elsewhere to return to the PRC to face charges brought by the PRC Government or to otherwise reach financial settlements with the PRC Government.

8.   As detailed below, SUN HOI YING, a/k/a "Sun Haiying," the defendant, conducted operations in the United States on behalf of the PRC Government to pressure, threaten, and collect personal information regarding victims of Operation Fox Hunt.  Among other things, as part of his

operations at the direction of the PRC Government, SUN hired private investigators in the United States to gather personal information on Operation Fox Hunt targets, labeled as "fugitives" by the PRC Government, and provided some of that information to the PRC Government; SUN sought out, located, and met with an Operation Fox Hunt target, Victim-3, in New York City, in coordination with a co-conspirator not named as a defendant herein who is a local U.S. law enforcement officer ("CC-2"); and SUN threatened and pressured Victim-3 during those meetings, including by threatening that the PRC Government would take certain adverse and retaliatory actions if Victim-3 did not comply with the wishes of the PRC Government.  SUN told Victim-3, during a recorded meeting, that the PRC Government had found him to help the PRC with Victim-3's case.

9.     According to checks of its database by the U.S. Department of Justice's FARA Unit in February 2022, SUN HOI YING, a/k/a "Sun Haiying," the defendant, has never registered under FARA or notified the Attorney General via the National Security Division pursuant to 18 U.S.C. § 951 and 28 C.F.R. § 73.3(a) that he has been acting as an agent of a foreign government.[1]

## Background on Operation Fox Hunt

10.    Based on my participation in this investigation and others, my review of law enforcement records, reports, and open-source information, and my training and experience, I have learned that the PRC Government is engaged in a worldwide initiative to forcibly repatriate PRC citizens living in the United States and other countries who are wanted in the PRC for allegedly committing various crimes. In the course of my investigation, I have learned, among other things, the following:

       a.     In approximately July 2014, the PRC announced "Operation Fox Hunt," a PRC Ministry of Public Security (the

---

[1] Pursuant to 28 C.F.R. § 73.3(b) and (c), foreign agents engaged in certain law enforcement or judicial activities may make their § 951 notifications to Interpol, an FBI Legal Attaché, or the Department of Justice's Office of International Affairs.  Based on my investigation, SUN does not fall into the categories of foreign agents that would make such notifications to these entities.

"MPS")[2] initiative to locate and repatriate Chinese nationals alleged by the PRC Government to be "fugitives" who had fled to foreign countries, including the United States.  The international operation has been described by the PRC Government as part of a larger anti-corruption effort in the PRC, launched in late 2013.  To advance these efforts, the PRC Government has engaged in unsanctioned, unilateral, and illegal practices, including coercion, extortion, and intimidation, all targeting these "fugitive" targets and their families in order to compel cooperation or repatriation to the PRC.

      b.   In or about 2015, the PRC also announced a parallel program to Fox Hunt called "Operation Skynet." Operation Skynet purports to include, among other things, an effort by the PRC Government to repatriate proceeds of corruption held by fugitives who have fled the PRC by both restricting and seizing assets still located in the PRC as well as attempting to recoup the allegedly corrupt proceeds overseas.

      c.   Operation Fox Hunt is overseen by the Central Commission for Discipline Inspection (the "CCDI").  The CCDI, which operates outside the Chinese judicial system, is an organ of the Chinese Communist Party (the "CCP") responsible for enforcing CCP rules and regulations, including, among other things, those related to alleged corruption.  The CCDI coordinates the Operation Fox Hunt campaign with, among other PRC entities, the MPS, the Supreme People's Procuratorate, the People's Bank of China, the Organization Department of the Central Committee of the CCP, and the Ministry of Foreign Affairs.

      d.   Ordinarily, international law enforcement activity involving the United States relies upon coordination with the U.S. Government and the government of the foreign country.  This typically involves steps such as official requests for information located in the United States, notice to the U.S. Government of any travel to the United States for the purpose of the foreign country's investigation, and formal requests to the U.S. Government for foreign officials or their agents to engage in any conduct on behalf of the foreign country.

---

[2] The MPS is the principal national police authority in the PRC.

5

e.    Additionally, nations such as the United States and the PRC are parties to various international agreements that govern, among other things, the procedure for the arrest of individuals charged with violations of the nation's laws, when those individuals are located abroad. For example, both the United States and the PRC can secure "Red Notices" from the International Criminal Police Organization, commonly known as Interpol, which requests that other nations participating in Interpol arrest the subject of the Red Notice for purposes of repatriation of that individual to the requesting nation.  The U.S. Department of State and the U.S. Department of Justice, among other U.S. Government entities, are responsible for administering the execution of Red Notices and other requests from foreign nations for arrests in the United States.  Through Operation Fox Hunt, the PRC has sought to circumvent this process by seeking to repatriate Chinese nationals charged with alleged violations of Chinese law to China, without involving the State Department or the Justice Department.

f.    In or about June 2016, the Justice Department and the U.S. Department of Homeland Security sent a letter to the CCDI outlining the conditions in which PRC Government officials could contact U.S. state and local law enforcement officials with respect to targets of Operation Fox Hunt. The letter noted that those requirements included, among other things:

i.    The MPS, Ministry of Supervision ("MOS"), or various Public Security Bureau ("PSB") officials must first make requests with the FBI Legal Attaché stationed at the U.S. Embassy in Beijing;

ii.    Police Liaison Officers at the PRC Embassy in Washington, D.C. must first make requests with the FBI's International Operations Division ("IOD"); and

iii.    MPS, MOS, PSB, and PRC Embassy officials may not enter agreements with state and local law enforcement officials without first making such requests to FBI IOD.

g.    As detailed below, instead of following these practices, the PRC Government tasked SUN HOI YING, a/k/a "Sun Haiying," the defendant, among others, with achieving goals relating to Operation Fox Hunt, and SUN traveled to

the United States and engaged in conduct at the direction of
the PRC Government designed to further the goals of
Operation Fox Hunt.

## SUN Uses U.S. Private Investigators to
## Target Operation Fox Hunt Victims

11.  Based on my involvement in this investigation, and
as described in greater detail below, I am aware that from
in or about October 2016 through in or about May 2017, SUN
HOI YING, a/k/a "Sun Haiying," the defendant, hired private
investigators in the United States to investigate Operation
Fox Hunt targets, including a U.S. citizen who previously
lived in the PRC, worked at a PRC Government-owned company,
and was subsequently accused by the PRC Government of
embezzlement ("Victim-1").  Personal identifying information
for Victim-1 collected by SUN was later published by the PRC
Government.  During the time that SUN was collecting
information about Victim-1 for the PRC Government, Victim-
1's daughter ("Victim-2"), a U.S. citizen who was pregnant
at the time, was held against her will in the PRC for
approximately eight months.

*Victim-1 Refuses to Return to the PRC and Is Accused of
Embezzlement*

12.  Based on my participation in this investigation
and others, my review of law enforcement records, reports,
open-source information, and law enforcement interviews with
Victims-1 and -2,[3] I have learned, among other things, the
following:

        a.   In or about 2010, Victim-1 immigrated to the
United States from the PRC, and later became a U.S. citizen.

        b.   Prior to leaving the PRC in or about 2010,
Victim-1 worked for a property management company (the "PRC
Property Company") that was owned and operated by the PRC
Government.

---

[3] Unless otherwise indicated, descriptions of communications,
conversations, and documents are set forth in substance and
in part.  Descriptions of recorded communications are based
on draft translations prepared by FBI linguists and are
subject to change.

c.   In or about 2010, after Victim-1 had already moved to the United States, one of Victim-1's former colleagues at the PRC Property Company was arrested in the PRC on embezzlement charges related to the PRC Property Company.

d.   After Victim-1's former colleague was arrested, that colleague contacted Victim-1 and informed Victim-1 that the PRC wanted Victim-1 to return to the PRC to sign documents necessary to start an investigation on Victim-1.

e.   In or about October 2010, a PRC official ("PRC Prosecutor-1") contacted Victim-1 and asked Victim-1 to return to the PRC to be a witness against her former colleague.  Victim-1 agreed to provide information and documentation, but Victim-1 refused to return to the PRC.

f.   After Victim-1's refusal to return to the PRC, PRC Government officials contacted one of Victim-1's relatives, a resident of the PRC, and alleged that Victim-1 had illegally taken a large sum of money out of the PRC, an allegation that Victim-1 denies.

*October 2016:  Victim-1's Daughter Is Held Against Her Will in the PRC for Eight Months*

g.   In or about October 2016, Victim-1's daughter, Victim-2, who is a U.S. citizen, traveled from the United States to the PRC with Victim-2's spouse and minor child to visit relatives.  Later that month, Victim-2, her spouse, and minor child attempted to leave the PRC to return to the United States.  At that time, PRC customs officials told Victim-2 that she could not leave the PRC and was subject to an "exit ban."  PRC customs officials told Victim-2 to contact Prosecutor-1 to address the "exit ban." Victim-2's spouse and minor child returned to the United States, but Victim-2 was not allowed to go with them.

h.   After Victim-2 was prohibited from leaving the PRC and returning to the United States with her family, Victim-2 contacted PRC Prosecutor-1.  PRC Prosecutor-1 told Victim-2 that Victim-1 had committed a crime and that the "exit ban" on Victim-2 was a consequence of Victim-1's fugitive status.  PRC Prosecutor-1 further told Victim-2 that Victim-2 would not be permitted to leave the PRC until Victim-2 helped cause Victim-1 to return to the PRC to resolve Victim-1's criminal case; that Victim-2 was not to

discuss the "exit ban" with the U.S. Government; and that the U.S. Embassy was helpless to address Victim-2's status in the PRC.  When Victim-2 explained to PRC Prosecutor-1 that she was pregnant and wished to deliver her baby in the United States, PRC Prosecutor-1 told Victim-2 she would deliver her baby in the PRC if the conditions were not yet met for the "exit ban" to be lifted.

*February 2017 – April 2017:  SUN Uses U.S. Companies and Persons to Collect Information about Victim-1 for the PRC*

13.  Based on my participation in this investigation and others, my review of law enforcement records, reports, open-source information, and law enforcement interviews with representatives from P.I. Firm-1, a person working at SUN's direction ("CC-1"), and Victim-1, I have learned, among other things, the following:

a.  CC-1 is a U.S. citizen living in the United States who had a social relationship with SUN HOI YING, a/k/a "Sun Haiying," the defendant.  In or about February 2017, SUN enlisted CC-1 to assist with finding Victim-1 and others for the PRC Government.  SUN claimed to CC-1 that this assistance would help the "Chinese Court" find fugitives who had fled from their alleged economic crimes so that lawsuits could be filed against them.  SUN further claimed there was potential for future cooperation between the United States and the PRC, and that this project would develop a "standard operating procedure."

b.  In or about March 2017, at SUN's direction, CC-1 accompanied SUN to meet with P.I. Firm-1 in the United States.  In advance of the meeting, SUN identified himself to P.I. Firm-1 as the owner of a PRC-based company that holds itself out as an insurance loss-adjusting company (the "SUN Company").  During the meeting, SUN discussed using P.I. Firm-1 to locate individuals in the United States. Following the meeting, P.I. Firm-1 was hired by the SUN Company, but all contact between P.I. Firm-1 and SUN was made through CC-1.

c.  In or about March 2017, SUN provided CC-1 approximately 35 names of individuals SUN described as PRC fugitives, including Victim-1.

d.  At SUN's direction, CC-1 then provided Victim-1's information to P.I. Firm-1.  Specifically, on or about March 25, 2017, CC-1 emailed P.I. Firm-1 a spreadsheet

with 12 names (the "Fugitive List Spreadsheet") which included a list of individuals with accompanying personal information as well as blank fields for the information that SUN was seeking from P.I. Firm-1, including current and previous home addresses, driver's license photographs, phone numbers, bank account balances, and residency status in the United States.  The first person listed on the Fugitive List Spreadsheet was Victim-1.  Victim-2's name also appeared in the Fugitive List Spreadsheet in a column titled "Relative Information."  At least 10 of the 12 individuals listed in the Fugitive List Spreadsheet has either been identified as an Operation Fox Hunt target by the PRC Government or is the subject of a Red Notice requested by the PRC Government.

      e.    On or about April 21 and 23, 2017, an investigator working for P.I. Firm-1 ("Private Investigator-1") conducted surveillance at Victim-1's home and obtained at least one photograph of Victim-1.  P.I. Firm-1 provided a report of this surveillance to CC-1 that included database research on Victim-1, the home address for Victim-1, and a photograph of Victim-1.

      f.    In or about April 2017, while still detained in the PRC, Victim-2 learned through relatives that an unknown man (known to law enforcement to be Private Investigator-1, as described above) had gone to Victim-1's home in the United States, asked for Victim-1's location, and took photographs of Victim-1 and -2's family members -- all of which caused fear and concern by Victim-1.

      g.    On or about May 8, 2017, CC-1 sent an email to P.I. Firm-1, which contained, among other things, the following message:

> "I forwarded the files to Mr. Sun last week, he is impressed as well.  Please let me know your banking information so that Mr. Sun can transfer payment from his headquarter [*sic*] in Hong Kong to your account. Or, Mr. Sun suggests to let his son pay you with cash[...].  Is it possible to give us more pictures taken on that day?  Especially the ones with her house and dog as background.  It'd be great if we could link her face and her residence together in a picture."

h.   On or about May 24, 2017, P.I. Firm-1 received payment via wire transfer from the SUN Company with an address in the PRC.

*May 2018:  Victim-1's Home Address Is Published and Disseminated by the PRC Government*

14.   Based on my review of open-source materials published on PRC-based news media websites, I know that by in or about June 2018, the PRC Government published a list of 50 Operation Fox Hunt targets who were believed to reside outside of the PRC.

15.   The list published by the PRC Government included, among other things, details regarding Victim-1's case, a photograph of Victim-1, and the Victim-1 home address provided by P.I. Firm-1 as described above.

16.   Based on my involvement in this investigation, review of reports, and law enforcement interviews of Victims-1 and -2, I am aware that the above-described publication of Victim-1's personal information in connection with the Operation Fox Hunt target list caused Victims-1 and -2 to fear for their safety and the safety of their family members.

*May 2017:  Victim-2 Is Finally Released from the PRC*

17.   Based on my participation in this investigation and others, my review of law enforcement records, reports, open-source information, and law enforcement interviews with Victims-1 and -2, I have learned the following, among other things, about Victim-2's release from the PRC:

a.   On or about May 28, 2017, U.S. officials in the PRC were notified that the "exit ban" as to Victim-2 would be removed provided Victim-2 carried certain documents provided by the PRC Government back to the United States to be provided to Victim-1.

b.   On or about May 29, 2017, Victim-2 was permitted by the PRC Government to leave the PRC and return to the United States.  In total, Victim-2 was detained in the PRC for approximately eight months.

## SUN Travels to the United States to Threaten a Fox Hunt Victim

18.   Based on my involvement in this investigation, and
as described in greater detail below, I am aware that in or
about December 2019, SUN HOI YING, a/k/a "Sun Haiying," the
defendant, traveled to the United States to meet with and
threaten Victim-3, an Operation Fox Hunt victim.  SUN
recruited others, including CC-2, a local U.S. law
enforcement officer based in New York City, as part of his
effort.  SUN -- directly and through CC-2 -- pressured
Victim-3 to resolve the case in the PRC against Victim-3 and
her family.

*Victim-3 Moves to the United States and Is Accused by the
PRC Government of Embezzlement*

19.   Based on my participation in this investigation
and others, my review of law enforcement records, reports,
open-source information, law enforcement interviews with
Victim-3, and reviews of recorded meetings, calls, and
messages, I have learned, among other things, the following:

a.   Victim-3 moved to the United States from the
PRC in or about 2001.  Prior to coming to the United States,
Victim-3 was an executive at a Chinese company that had been
owned by the PRC Government.

b.   In or about 2002, after Victim-3 moved to the
United States, the PRC accused Victim-3 and her first ex-
husband of using illegally obtained PRC funds to finance
purchases of private property.  In connection with these
allegations, the PRC Government detained Victim-3's first
ex-husband and multiple members of Victim-3's family.  In or
about 2003, PRC prosecutors obtained a warrant for Victim-
3's arrest and thereafter obtained a Red Notice seeking
Victim-3's arrest abroad.

i.   Between in or about 2007 and 2010, PRC
trial and appellate courts evaluated the charges against
Victim-3's family and Victim-3's first ex-husband,
ultimately concluding that they were not guilty.

ii.   Despite these rulings, the PRC
Government continued its efforts to seize their property,
including by implementing a confiscation procedure to seize
property owned by an Operation Fox Hunt target within one
year after the issuance of a Red Notice if that target did
not return to the PRC to answer the charges.  In addition,

12

the PRC Government began efforts to seize property belonging to Victim-3's second ex-husband.

      iii.    In or about July 2019, the PRC Government seized Victim-3's second ex-husband's property, which the PRC Government claimed also belonged to Victim-3.

*December 2019:  SUN Coordinates with a Local U.S. Law Enforcement Officer to Lure Victim-3 to a Meeting*

20.  Based on law enforcement interviews with Victim-3, and reviews of recorded meetings, calls, and messages, I have learned, among other things, the following:

      a.  On or about December 1, 2019, CC-2, acting at the behest of SUN HOI YING, a/k/a "Sun Haiying," the defendant, contacted Victim-3, identified himself as law enforcement, and told Victim-3 that CC-2 knew about Victim-3's trouble in the PRC and requested a meeting. Victim-3 agreed to meet CC-2 at a restaurant in Queens, New York, later that day.

      b.  On or about December 1, 2019, after this initial call, Victim-3 met with CC-2 in Queens, New York. CC-2 displayed law enforcement identification and again indicated that he was a local U.S. law enforcement officer.[4] During the meeting, Victim-3 and CC-2 discussed the following:

      i.    CC-2 claimed that he was not attending the meeting as a representative of either the U.S. Government or the PRC Government.

      ii.    CC-2 asked Victim-3 whether Victim-3 would be willing to meet with an individual to attempt to resolve Victim-3's case in the PRC.

      iii.    When Victim-3 agreed to meet this person, CC-2 contacted SUN, who then appeared in the private dining room at the restaurant.

---

[4] Based on my involvement in this investigation and a review of relevant law enforcement records, I am aware that, at all times relevant to this Complaint, CC-2 was a local U.S. law enforcement officer.

c.   After SUN arrived at the restaurant, SUN and Victim-3 discussed, among other things, the following:

i.   SUN had been paid by the PRC Government to travel to the United States to meet with Victim-3.

ii.   In particular, SUN told Victim-3 that he was in the United States because the PRC had found him to help them with Victim-3's case. *See supra* ¶ 10(c).

iii.   SUN was tasked by the PRC Government to determine whether, and on what terms, if any, Victim-3 would settle Victim-3's case with the PRC Government.

iv.   SUN conveyed that if Victim-3 did not agree to settle with the PRC Government, SUN would contact a U.S.-based tax attorney, who would sue Victim-3's second ex-husband for tax evasion.  SUN additionally threatened that the PRC Government was in possession of evidence that would prove the U.S. tax evasion allegations, and that as a private party, SUN could provide this information to the Internal Revenue Service ("IRS") or other U.S. Government officials.  SUN showed copies of the allegedly incriminating documents to Victim-3.

v.   In addition, SUN stated that if Victim-3 did not agree to settle, the PRC Government would reinstate the dismissed Chinese criminal case against Victim-3's first ex-husband.

vi.   SUN told Victim-3 that SUN would be leaving for the PRC shortly.  SUN introduced Victim-3 to another co-conspirator not named as a defendant herein who was also present at the meeting, and who was a leader of a local community organization ("CC-3"), and told Victim-3 to use CC-3 as a local contact once SUN returned to the PRC. CC-3 provided his contact information to Victim-3.

vii.   SUN instructed Victim-3 to provide certain documentation to begin settlement negotiations with the PRC Government, including, among other things, a document signed by Victim-3 indicating that she was willing to settle her case with the PRC Government.

viii.   SUN also provided his phone number, which was the phone number that CC-2 had used to contact Victim-3, and instructed Victim-3 to contact SUN via an encrypted messaging application ("Application-1").  SUN

14

provided his screenname (the "SUN Username") on Application-1 to Victim-3 and connected with Victim-3 on Application-1 before the meeting ended.

        ix.     Using Application-1, SUN sent Victim-3 an article regarding the properties in the name of Victim-3's second ex-husband that were being publicly auctioned in the PRC.

*December 2019:  SUN Continues to Threaten Victim-3 on Behalf of the PRC Government*

    21.  Based on law enforcement interviews with Victim-3, and reviews of recorded meetings, calls, and messages, I have learned, among other things, the following:

        a.   On or about December 2, 2019, using Application-1, SUN HOI YING, a/k/a "Sun Haiying," the defendant, messaged Victim-3 and asked Victim-3, among other things, what SUN should tell his client (which I believe to be a reference, as explained herein, to the PRC Government). SUN further advised Victim-3 that he was prepared to pass relevant documents from Victim-3 to the PRC Government.

        b.   Following the December 1, 2019 meeting, Victim-3 contacted the FBI and subsequently agreed to assist the FBI's investigation.

        c.   On or about December 3, 2019, at the direction of the FBI, using Application-1, Victim-3 told SUN that she would provide the documents SUN requested.  SUN suggested that Victim-3 meet with SUN the following day for SUN to accept the documents.

        d.   On or about December 4, 2019, at the direction of the FBI, Victim-3 met with SUN in Queens, New York.  Based on my review of a draft transcript of this meeting, which was recorded, I have learned, among other things, the following:

            i.     SUN was accompanied at the meeting by a person he said was his son.  SUN told Victim-3 that he brought his son to the meeting because it was a "different era" now and he wanted his son to hear about how "dark" society can be.  SUN continued to explain that Victim-3 was an individual, but "they" were an organization -- which I believe, based on my training, experience, and participation

in this investigation, was a reference to the PRC
Government.

       ii.    Victim-3 provided a set of documents
(the "Victim-3 Documents") to SUN, and told SUN she would
provide additional documents in the coming days.  SUN told
Victim-3 she could provide copies of the additional
documents via Application-1.

       iii.    SUN and Victim-3 then discussed the
details of the case against Victim-3.  When Victim-3
attempted to explain her innocence, SUN told Victim-3 that
he did not care about the details.  SUN further told Victim-
3 that he did not believe Victim-3's explanations, and that
Victim-3 would not be able to afford to hire teams of
professionals and experts to figure out the intricacies of
the case.  Victim-3 asked if the PRC Government wanted to
sue Victim-3 and her second ex-husband in the United States,
and SUN reiterated his claim that the PRC Government can
simply gather the information and submit it to the IRS
without the trouble of a lawsuit.

       iv.    Victim-3 asked SUN how it was possible
for the PRC Government to provide materials to the IRS
directly, and SUN replied that the PRC Government can just
as easily find someone in the United States to submit the
materials.  Victim-3 told SUN that she understood SUN to be
telling her that she would be in a lot of trouble if she did
not settle the case, and SUN replied by claiming that he was
providing her this information out of the goodness of his
heart, because things were not as simple as Victim-3 might
think, which Victim-3 understood as a threat.

       v.    SUN then told Victim-3 that he believed
Victim-3 had overestimated her own abilities, whereas the
PRC Government found SUN, a professional, as a consultant to
help them on the case.

       vi.    When Victim-3 told SUN that she hoped
SUN would help her end her case in the PRC, SUN replied that
he could not end the case, but that he could pass on
whatever SUN learned from Victim-3 to the people who hired
him (*i.e.*, the PRC Government).  Victim-3 then asked SUN for
information on the person at the CCDI who had hired SUN, and
SUN told Victim-3 he would not discuss that because "the
time has passed" and further told Victim-3 she should just
think about how she wanted to proceed.  Later, Victim-3

asked SUN if he was being paid by the people who hired him to find Victim-3, and SUN replied, "of course" and that the PRC Government used third party experts now.

       vii.    Victim-3 asked SUN, if she agreed to the terms of the PRC Government, whether they would still follow through on their threat to release information to the IRS, and SUN replied that if Victim-3 agreed to the terms, then "they won't have to do the second thing."  However, SUN told Victim-3 that if their talks stopped, then passing the information would be his next course of action.

       e.    Following the December 4, 2019 meeting, SUN continued to communicate with Victim-3 using Application-1. On or about December 7, 2019, SUN left the United States and returned to the PRC.  Shortly after returning to the PRC, SUN messaged Victim-3 using the Application-1 and asked Victim-3 to prepare the documents he had requested as soon as possible.

*February 2020 – October 2020:  SUN Coordinates with the Local U.S. Law Enforcement Officer to Collect Information about Victim-3 and other Operation Fox Hunt Victims*

      22.  Based on law enforcement interviews with Victim-3, and reviews of recorded meetings, calls, and messages, I have learned, among other things, that between in or about February 2020 and in or about October 2020, at the behest of SUN HOI YING, a/k/a "Sun Haiying," the defendant, CC-2 continued to pass information between SUN and Victim-3. Based on my review of the recorded meetings, calls, and messages between CC-2 and Victim-3, and from law enforcement interviews of Victim-3, I have learned the following about SUN's continued pressure campaign against Victim-3:

       a.    On or about February 9, 2020, at the direction of the FBI, Victim-3 met with CC-2 in Queens, New York.  During that meeting, CC-2 and Victim-3 discussed, among other things, the following:

        i.    CC-2 said that he did not believe that SUN would file a lawsuit -- which Victim-3 understood to be a reference to the lawsuit SUN threatened would be filed if Victim-3 did not settle with the PRC Government -- while SUN and Victim-3 were negotiating, but that CC-2 believed that SUN was serious about such a threat if they were not able to reach a resolution.

      ii.     CC-2 indicated that he viewed himself as an intermediary between Victim-3 and the PRC government, and was not on either's side.

      iii.     CC-2 instructed Victim-3 that if SUN was able to make a settlement offer that it would likely come through CC-3, and that CC-3 would be Victim-3's point of contact.  CC-2 reiterated that he was only participating as a favor to a friend, that CC-2 would not be involved beyond passing Victim-3's questions to SUN, and that CC-2 already had told SUN that because of CC-2's job, CC-2 would not act on behalf of the PRC Government.

      b.    On or about February 22, 2020, CC-2 sent Victim-3 an audio message over Application-1 in which CC-2 stated that he had communicated with SUN and that SUN had indicated that materials about Victim-3's case had been forwarded to the relevant PRC authorities, but that due to the ongoing COVID-19 pandemic, the response might be delayed.

      c.    In or about March 2020, Victim-3 and CC-2 exchanged messages over Application-1 in which CC-2 relayed a message from SUN regarding the status of Victim-3's case and stated that PRC Government authorities were working to verify the information provided by Victim-3.

      d.    On or about June 19, 2020, Victim-3 and CC-2 exchanged additional messages over Application-1.  Based on my review of this exchange, I have learned, among other things, that CC-2 agreed to continue to follow up with SUN about Victim-3's case.

      e.    In or about July 2020, Victim-3 and CC-2 exchanged additional messages over Application-1.  Based on my review of this exchange, I have learned, among other things, that CC-2 told Victim-3 that he and SUN had spoken the week before.  CC-2 further told Victim-3 that "relevant leaders have approved the investigation of the assets in Wuhan and Shenyang" but that "from what [SUN] said it doesn't look too optimistic with the further investigation."

      f.    On or about October 22, 2020, at the direction of the FBI, Victim-3 participated in a recorded meeting with CC-2 in Queens.  Based on my review of that recording, I have learned, among other things, that CC-2 and Victim-3 discussed the following:

      i.     CC-2 told Victim-3 that the PRC Government definitely wants Victim-3's case to be settled, but that Victim-3 should give a positive gesture to the PRC Government.  Victim-3 responded by telling CC-2 that SUN had asked her to write something to the PRC Government, and that she did.  CC-2 replied that SUN told CC-2 that Victim-3 still owed papers to the PRC Government.  Victim-3 told CC-2 that she thinks the papers SUN was waiting for were not relevant to her case.

      ii.    CC-2 told Victim-3 that he had informed SUN he would be meeting today with Victim-3, and that he would tell SUN that Victim-3 said the papers SUN was waiting for were not needed.

      iii.   CC-2 further told Victim-3 that he asked SUN what the PRC Government's stance on Victim-3's case was, and SUN replied that they wanted to see what Victim-3's attitude and response was first.

     g.    On or about October 26, 2020, CC-2 contacted Victim-3 using Application-1.  Based on law enforcement interviews with Victim-3 regarding that conversation, I have learned, among other things, that CC-2 and Victim-3 discussed the following:

      i.     CC-2 told Victim-3 that he told SUN about his October 22, 2020 meeting with Victim-3.

      ii.    CC-2 further told Victim-3 that SUN reaffirmed that Victim-3 needed to provide the documents that SUN previously requested if Victim-3 wanted to resolve her case with the PRC Government.

   23.   On or about July 16, 2020, U.S. Magistrate Judge for the Southern District of New York, the Honorable Robert W. Lehrburger, issued a search warrant for CC-2's cloud storage account (the "CC-2 Cloud Account").  Based on a review of encrypted messages sent through Application-1 between the SUN Username and a username CC-2 identified as his own to Victim-3 (the "CC-2 Username"), I know that CC-2 reported to SUN HOI YING, a/k/a "Sun Haiying," the defendant, on his interactions with Victim-3 and that SUN directed CC-2 to pass certain messages to Victim-3 from the PRC Government.  For example:

     a.    On or about February 6, 2020, CC-2 reported to SUN that Victim-3 came to look for CC-2 at a law

enforcement agency office in New York, New York and wanted
to speak with CC-2 privately.

        b.    On or about February 10, 2020, CC-2 reported
to SUN that he had met with Victim-3 and agreed to call SUN
to provide further information.

        c.    On or about February 21, 2020, SUN sent CC-2
instructions on a message to deliver to Victim-3 regarding
the status of her case with the PRC Government.

    24.    Based on my review of information from law
enforcement databases and my review of encrypted messages
retrieved from Application-1 in the CC-2 Cloud Account, I
further know that SUN HOI YING, a/k/a "Sun Haiying," the
defendant, communicated with CC-2 regarding other Operation
Fox Hunt victims.  For example:

        a.    On or about December 2, 2019, SUN sent CC-2 a
PDF attachment containing a photograph of an individual
("Victim-4"), a photograph of Victim-4's PRC passport, and a
photograph of Victim-4's permanent residence permit issued
by a European country.  The PDF contained additional
personal information about Victim-4, including PRC
identification numbers and travel history.  Additionally,
the PDF included information alleging that Victim-4 had
created a shareholding company to "lure in capital" but had
significant outstanding debts.  In addition to the
information about Victim-4, the PDF contained photographs
and personal information regarding individuals described in
the PDF as Victim-4's wife, daughter, and mistress.

        b.    Victim-4 is the subject of a Red Notice
requested by the PRC Government and is a target of Operation
Fox Hunt.  The Red Notice indicates that, among other
places, Victim-4 is likely to be located in the United
States.

        c.    Also on or about December 2, 2019, SUN sent
CC-2 two additional photographs of PRC passports.  The PRC
passports depicted two individuals, Victims-5 and -6. SUN
additionally sent close-up images of photographs of Victims-
5 and -6 which had been cut from the PRC passports.  SUN
then sent CC-2 a link to a PRC-based news article describing
Victim-5's alleged crimes in the PRC.

        d.    Victims-5 and -6 are the subjects of Red
Notices requested by the PRC Government and are targets of

Operation Fox Hunt. The Red Notices indicate that Victims-5 and -6 are likely to be located in the United States.

### SUN Engages Additional Private Investigators to Target Victim-3 and Other Fox Hunt Victims

25.   Based on, among other things, law enforcement interviews with members of a private investigation firm ("P.I. Firm-2") and a person working at the direction of SUN HOI YING, a/k/a "Sun Haiying," the defendant ("SUN Intermediary-1") I have learned, among other things, the following:

a.   In or about November 2019, SUN hired Intermediary-1, a person living in the United States with whom SUN had a social relationship, to locate an individual ("Victim-7") who SUN told Intermediary-1 was likely located in Canada.  SUN told Intermediary-1 that Victim-7 was a "missing person" and that Victim-7's father was attempting to locate him.

b.   Victim-7 is the subject of a Red Notice requested by the PRC Government and is a target of Operation Fox Hunt.  The Red Notice indicates that Victim-7 is wanted for alleged economic crimes by the PRC Government.

c.   On two occasions, SUN met Intermediary-1 in Canada for the purpose of attempting to locate Victim-7. SUN did not disclose to Intermediary-1 that Victim-7 was an Operation Fox Hunt target.

d.   At SUN's direction, Intermediary-1 hired P.I. Firm-2 to assist with the search for information regarding Victim-7.  Using Application-1, SUN sent Intermediary-1 a photograph of an invoice to demonstrate how the SUN Company should be billed for services.  Based on a review of that photograph, I am aware that the invoice, which is partially obscured, discusses a background investigation for a female person with the same date of birth as Victim-3.

e.   Later, using Application-1, SUN sent Intermediary-1 a photograph of a residential home with an address in Queens, New York.  Based on a review of that address and my involvement in this investigation, I know that the address is one of Victim-3's former home addresses.

f.   After sending the photograph of Victim-3's former home address to Intermediary-1, SUN told

Intermediary-1 that the person he was pursuing in connection
with that address had not paid taxes in the United States
and that he planned to use that information to blackmail
that person.

WHEREFORE, the deponent prays that a warrant be
issued for the arrest of SUN HOI YING, a/k/a "Sun Haiying,"
the defendant, and that he be arrested and imprisoned, or
bailed, as the case may be.

/s/ Kelsey Palermo, by the Court, with permission
Kelsey Palermo, Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission of this
Complaint by reliable electronic means, pursuant to
Federal Rule of Criminal Procedure 4.1, this
18th day of February 2022

JAMES L. COTT
United States Magistrate Judge